

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

James D. Schneller;
Heirs and beneficiaries of Marjorie C. Schneller,
   by James D. Schneller, trustee ad litem;
Estate of Marjorie Schneller, by and through
   James D. Schneller, trustee ad litem;
Marjorie Zitomer, executrix of the Estate
   of Marjorie Schneller;
Estate Of George H. Schneller, by and through
   personal representative James D. Schneller
plaintiffs

v.

Prospect Park Nursing and Rehabilitation
   Center, it's owners and employees,
Marjorie Zitomer,   Richard Schneller,
  T. Sergeant Pepper Esquire
defendants

CIVIL ACTION

NO. 08 5704

JURY TRIAL DEMANDED

## COMPLAINT

### I.  PARTIES

1) James Schneller is a resident of Radnor Township, Delaware County, Pennsylvania, having lived with his parents in their home in Chester County, Pennsylvania for 36 of his 48 years.

2) Marjorie C. Schneller was the mother of James D. Schneller.

3) George H. Schneller, husband to Marjorie Schneller, was the father of James D. Schneller. He died on October 30, 2001.

Defendants

4) Prospect Park Nursing and Rehabilitation Center ( also referred to herein as Prospect Park Nursing Home), located at 815 Chester Pike, Prospect Park, PA, is a nursing and long term care facility in Delaware County that also provides beds for ventilator-dependant patients. The facilities' owners, employees, and any employees or vendors to the nursing facility who may be

1

implicated in these proceedings and are claimed to have contributed to the death of Marjorie Schneller. This action is an action in professional liability and intentional tort against this defendant.

5) Named as defendants are James Schneller's sister Marjorie Zitomer, of Albany, N.Y., and plaintiff's brother G Richard Schneller, of Great Falls, Virginia.

6) The executrix Marjorie Zitomer, is named as an involuntary plaintiff in this action.

7) G. Richard Schneller ( "R. Schneller" ) is the brother of plaintiff and co-administrator of the estate of George H. Schneller. He resides at Great Falls, Virginia. Richard Schneller was intentionally not named as executor or trustee on either estate. He has been elevated to an administrative role by the executrix of the maternal estate, which by it's nature predominates.

8) Probate and administration of the estates of both parents took place in the Chester County Orphans Court. Appeal of the final accounts of the estates is pending in the Superior Court of Pennsylvania, Eastern District, No. 440 EDA 2005.

9) T. Sergeant Pepper Esquire, attorney for executrix and co-administrators M. Zitomer and R. Schneller, defendants named above, is a licensed professional who resides at Still Pond Maryland. This action is an action in professional liability and/or intentional tort against this defendant.


Defendants Alleged In The Event That Diversity Jurisdiction Is Inapplicable

| | | |
|---|---|---|
| James D. Schneller, Heirs And Beneficiaries of Marjorie C. Schneller, Estate Of Marjorie C. Schneller, By And Through J. Schneller, M. Zitomer, Estate Of George H. Schneller, By And Through   James D. Schneller | v. | Monica Rendell, R.N., Fran "Doe", R.N. Herman McGill, M.D.; Suburban Pulmonary Medicine, Daniel Dupont D.O., E.Heffelfinger D.O. & Gerald Meis D.O.; Hepburn Wilcox Hamilton Putnam LLP |

10) Services at the Prospect Park Nursing Home to Marjorie C. Schneller were supervised by Monica Rendell R.N. and by a male named Fran (Fran "Doe") both of whom were nurse employees in the ventilator section of the facility. Monica and Fran are licensed professionals at the above named facility in Delaware County, Pennsylvania. Any action against these parties is an action in professional liability and/or intentional tort.

11) Marjorie Schneller's physician at the above nursing facility was Herman McGill, M.D., who is a licensed physician in Delaware County, Pennsylvania. Any action against this party is an action in professional liability and/or intentional tort.

2

12) Drs. DuPont, Heffelfinger, and Meis, who together constitute Suburban Pulmonary Medicine of Ridley Park, Pennsylvania, are the Pulmonary physicians who oversaw care of ventilator-dependent patients at the Prospect Park Nursing Center. They are licensed professionals with offices in Delaware County, Pennsylvania. Any action against these parties is an action in professional liability and/or intentional tort.

13) Hepburn, Willcox, Hamilton, and Putnam LLP is a law firm with offices formerly located at Suite 1100 in One Penn Center, Philadephia, Pennsylvania. Hepburn, Willcox, Hamilton, and Putnam LLP of Philadelphia, PA was the law firm at which T. Sergeant Pepper Esquire was employed, during the time of the acts alleged. This action against this party is an action in professional liability and/or intentional tort.

14) Hepburn, Willcox, Hamilton, and Putnam LLP wrote the wills and deeds of trust which were in force at the time of death of the Marjorie C. Schneller and George H. Schneller. Hepburn, Willcox, Hamilton, and Putnam LLP wrote the powers of attorney which were in force at the time of the occurrence and also wrote an advance health directive for Marjorie C. Schneller.

## II. JURISDICTION AND VENUE

15) This Court has jurisdiction over this action because there is complete diversity of citizenship between defendants and plaintiffs, and because the amount in controversy between each plaintiff and defendants exceeds $75,000.

16) This Court has jurisdiction pursuant to 28 U.S.C. §1331 because the defendants violated Acts of Congress. Violation of statutes by defendants includes violation of 42 U.S.C.A. § 14402 et seq. entitled Assisted Suicide Funding Restriction. In violation of said law, defendants have applied funds appropriated by Congress for the purpose of paying for the provision of health care services, federal funds under certain grant programs including Medicare and Medicaid, and federal advocacy grants, to pay for, provide, and contribute to payment or coverage, for health care items and service furnished for the purpose of causing, and for the purpose of assisting in causing, the death of Marjorie C. Schneller, by euthanasia, mercy killing, and assisted suicide. This statute shows an intent by Congress to enable a cause of action for the acts or omissions which they refer to.

17) This Court has jurisdiction pursuant to 28 U.S.C. §1331 because the defendants, under color of statute, regulation, custom, and usage, of the Commonwealth of Pennsylvania, subjected plaintiffs, and caused plaintiffs to be subjected, to the deprivation of equal protection of the laws, and deprivation, without due process of law, of essential rights and liberties which are guaranteed by the United States Constitution, including the right to life, liberty, and property, to free speech,

to privacy, and their right to fundamental privileges and immunities, and so defendants are liable to plaintiffs under 42 U.S.C.A. § 1983 for a claim of deprival of civil rights.

18) This Court has jurisdiction pursuant to 28 U.S.C. §1331 because the defendants conspired for the purpose of impeding, hindering, obstructing, and defeating, the due course of justice in the Commonwealth of Pennsylvania, with the intent to deny plaintiffs the equal protection of the laws, and to injure or murder they and injure their property for lawfully enforcing and attempting to enforce, their rights, and the rights of a class(es) of persons, to the equal protection of the laws, and so defendants are liable to plaintiffs under 42 U.S.C.A.§ 1985(3) entitled Conspiracy to interfere with civil rights.

18a) This Court has jurisdiction pursuant to 28 U.S.C §1331 because the defendants conspired for the purpose of impeding, hindering, obstructing, and defeating, the due course of justice in the Commonwealth of Pennsylvania, and to prevent by force, intimidation, and threat, and cause to be done acts in furtherance of the object of such conspiracy, including through severe injury and murder, the having and exercising rights and privileges and the equal protection of the laws of citizens of the United States, and to injure plaintiffs and their property for lawfully enforcing and attempting to enforce, their rights, and the rights of a class(es) of persons, to the equal protection of the laws. Defendants are therefore liable to plaintiffs under 42 U.S.C.A.§ 1985(2) entitled Conspiracy to interfere with civil rights - Obstructing Justice.

18b) This Court has jurisdiction pursuant to 28 U.S.C.§1331 because the defendants, having knowledge that any and all of the wrongs mentioned in this complaint, were conspired to be done and were about to be committed, and having power to prevent or aid in preventing the commission of the same, neglected or refused so to do; and because said wrongful acts were committed, and additionally because the death of Marjorie Schneller was caused by said wrongful acts and neglect. Defendants are therefore liable to plaintiffs under 42 U.S.C.A.§ 1986 for neglect to prevent. Defendants are liable under a cause of action for failure to warn.

18c) This Court has jurisdiction pursuant to 28 U.S.C.§1331 because plaintiffs have been deprived of life, liberty, and property, without due process of law, under Article VI and the Fifth Amendment of the United States Constitution.

18d) This Court has jurisdiction pursuant to 28 U.S.C.§1331 because the defendants concurrently and integrally violated regulations including 42 C.F.R.§ 483.10 et seq. entitled Requirements for Long Term Care Facilities. This statute shows an intent by Congress to enable a cause of action for the acts or omissions which they refer to.

18e) This Court has jurisdiction pursuant to 28 U.S.C.§1331 and under 42 C.F.R.§ 1983, because the defendants, including in their acts which constitute federal questions, or concurrently and integrally therewith, have violated statutes enacted by Congress including 21 U.S.C.A.§ 802 et seq.; 29 U.S.C.§ 794 et seq.; 42 U.S.C.§ 2000a et seq.; 42 U.S.C.A. § 2000bb et seq.; 42 U.S.C. § 3001 et seq.; 42 U.S.C.§ 10400 et seq.; 42 U.S.C.§ 6101 et seq.; 42 U.S.C.§ 13981 et seq.; 18

4

U.S.C § 113, 18 U.S.C § 114, 18 U.S.C § 241, 18 U.S.C § 242, 18 U.S.C § 247, 18 U.S.C §1035, 18 U.S.C §1111, 18 U.S.C §1113, 18 U.S.C §1117, and 18 U.S.C §1513

18f) Jurisdiction is urgently requested because plaintiff's causes of action, both those of a Federal nature and those of a State nature, are prevented of a trial in plaintiff's civil action No. 04-01492 in the Delaware County, Pennsylvania, Court of Common Pleas, in contravention of the Constitution of the United States of America, Article 6, Amend. 1, Amend. 4, Amend. 5, and Amend. 14, and the Pennsylvania Constitution Art. 1 § 1, Art. 1 § 11, Art. 1, § 26, Art V § 10, and despite James D. Schneller's concerted effort to bring all violations of criminal codes to a criminal prosecution.

18g) This Court has pendant jurisdiction over claims herein which fall under the supplemental jurisdiction of the Court pursuant to 28 U.S.C §1367 and Article III of the United States Constitution, because of the violation of state law by the defendants.

18h) Venue may be set in this district pursuant to 28 U.S.C. § 1391(a) and (d) because the occurrence took place in this district, in Delaware County of Pennsylvania.

18i) This action is filed pusuant to 42 Pa.C.S. §5535, within a year of closing of a prior case in the same matter, which was a termination not made on the merits of the case.

## III. ALLEGATIONS

19) Plaintiff James Schneller in 1984 returned to live with his parents in their home in Tredyffrin Township, Pennsylvania, after a debilitating vehicle-on-pedestrian accident left him mentally disabled. He slowly recuperated;

20) Marjorie Schneller, a housewife with degree in Biology, and laboratory trained, and George Schneller, a prominent pharmacy executive and expert, had included plaintiff, their son, in all matters of responsibility by 1994. Where the parents grew infirm, James Schneller assimilated medical responsibilities and decisions, and as his duties increasingly called for driving either parent to appointments, petitioner was included and then substituted as caregiver for both parents;

21) James Schneller during hospital stays by parents became familiar with things medical and, acting as knowledgable caregiver, he verified procedure and prescriptions as much as possible, called and wrote to physicians at appropriate times, and made analysis of hospital and nursing home treatment and patient status;

22) Parents included plaintiff at family conferences, some resulting in crucial decisions. Petitioner was responsible for daily pharmaceutical application, including injections of 2 drugs

which had to be measured, heated, and or mixed prior to injection. Petitioner was processor of bills and insurance refunds along with his father;

23) Marjorie Schneller recuperated from a prior episode of pulmonary failure. In 1998, for reasons unexplained, she became lethargic and then slipped into a coma. She was unconscious for in excess of a month, on a respirator. Her husband stayed with her and plaintiff lent an abundance of support. Specialists exhibited opinions ranging from surgery to simple patience. A pituitary disease and subsequent prescribed steroids were suspect. Consciousness developed through eyes opening and then continued.

24) On a certain day all family members were to meet at bedside to ask Mrs. Schneller her feelings about adhering to her living will. Plaintiff was mystified as to the scheduling of this event, because the threat of terminality was as of late negated by recuperation that had occurred. Plaintiff advised his mother. When parties arrived Marjorie had rejuvenated to total consciousness, and she wrote a message that she wanted a 24 hour nurse;

25) She was weaned from the respirator and lived at home within two months, still ambulatory and completely rejuvenated in mind and spirit. Bryn Mawr Hospital like many facilities maintains a policy of honoring the family's wishes before adhering to any living will. This policy resulted in Marjorie Schneller's additional years, which she enjoyed. The parents were placated that their medical facility had chosen wisely, and they did not take a hard look at other implications of Mrs. Schneller's living will.

26) In the two years that passed, no proposal was made to change or revoke Mrs. Schneller's living will. Plaintiff was not of a legal bent nor were his parents. This time was full of activity. George Schneller lost the ability to drive and plaintiff was engrossed with the additional duties now including a second parent needing trips in the car;

27) At 80 years Marjorie Schneller was burdened with a number of infirmities that made life difficult, yet these were typical of the age group, and she and her husband sought successfully, through excellent care and personal dedication, to improve their condition. Marjorie was elderly, semi-bedridden, completely cognizant, friendly, and assertive. Marjorie's heart labored under a mitral valve prolapse, which she had been treated for for 5 years;

28) Marjorie Schneller's day to day health improved noticeably in 2000 and 2001. She did not see fit, for a year prior to the event next described, to schedule any special appointments with her pulmonologist or cardiologist. She often indicated improvement to plaintiff, and had an appetite not seen since before her 1998 coma incident. Only routine checkups, dental exams, or visits to the optometrist and podiatrist were needed in the 18 months prior to June 27, 2001. She had cataracts removed from both eyes with great success;

29) James Schneller was entrusted with Marjorie Schneller's well being and was specifically trained by George Schneller should George's condition decline.

30) During the week of June 25, 2001, George Schneller underwent the first of two cataract surgeries. George and James returned late that afternoon to find Marjorie in an unconscious, physically ill, and mentally incoherent state. Hospital reports indicated a great concern about her cognitive state, as she had been completely alert immediately prior to this incident. Many of her toes appeared bent or broken;

31) After emergency room treatment and a day in observation, Marjorie went into, then recovered from, critical care episode, but on release 24 days later it was necessary to keep her on a respirator due to expectations of a lengthy rehabilitation.

32) Marjorie, on becoming conscious intermittently and then consistently 10 days later, was burdened by this event, and revealed that something personally affronting and severe had happened on that day while James and George Schneller were away;

33) James Schneller for these reasons telephoned the Tredyffrin Township Police. An officer visited the home, but George Schneller, bereaved and ailing, was opposed to any investigation until further notice. James aquiesced. Contact with the police continued and James Schneller attempted to have an investigation opened in 2002. There had been alarm breaches in the months preceding this event, and a home care aide had been in the home with Mrs. Schneller that day. A complaint for wrongful death and negligence was filed in this Court on September 30, 2003: Schneller, estate of Schneller v. Able Home Care, Delaware County No. 03 - 6700. Service has not been made on the defendant in that case. Defendant is claimed to have not called an ambulance for Marjorie Schneller, and to have left her alone in the home in a delerious state;

34) Marjorie Schneller was transferred on July 24, 2001 to the Prospect Park Nursing Home in Prospect Park, Delaware County, Pennsylvania. Marjorie Schneller was still on a breathing machine, but had recuperated otherwise and communicated by gestures and writing when necessary. She was progressively weaning off of the respirator and continued to. James Schneller maintained oversight with the medical staff at Prospect park Nursing Home, initially requesting a more suitable bed with airflow;

35) George Schneller, at a time when his illness hastened, placed Petitioner in charge of safe deposit boxes, and a certain sum of money which was for use in any emergency including any situation involving Marjorie Schneller or himself. At this time he also provided Petitioner with signed authorization to view hospital archives for he or Marjorie.

36) On August 8, 2001, Dr. McGill, Marjorie Schneller's assigned physician at Prospect Park Nursing Home, discontinued dosages of ACTH and HGH Growth Hormone. Marjorie Schneller had a condition called hypopituitary, a hormonal 'shortage' of the pituitary gland. ACTH is

7

produced by the pituitary and regulates hormone production by other glands. HGH is also produced by the pituitary gland.

37) ACTH and Human Growth Hormone were prescribed for the patient by licensed physician and endocrinologist Dr. Bertram Channick for many years, to make up for reduced pituitary function. Research is very active on HGH, and it has been shown to noticeably increase lung efficiency and lung capacity.

38) Plaintiff objected to Dr. McGill about the discontinuation of these prescriptions to no avail. Plaintiff requested their resumption and was rebuffed. Plaintiff had the unpleasant experience during the period of time here described where nurses were very forward about scrutinizing and asking what, if anything, he was holding in his hands while next to his mothers bed, including the mention of needles. Plaintiff at the time did not realize that this questioning rather than typical family visitor procedure, may have stemmed from staff knowledge of his wishes for continued hormone replacement.

39) Marjorie Schneller, after a bout with an infection in early August of 2001, then began a regimen of respiratory weaning, and Speech and Eating therapy, and Occupational therapy. She was weak but entirely conscious and alert.

40) On a Friday night in September 2001, plaintiff, arriving for his daily visit, discovered an entry in Nursing notes that indicated morphine was being administered to Mrs. Schneller. Plaintiff had indicated to Psychologist Dr. Jolapara in August 2001 that use of narcotics was not advised, and provided the name and number of a past physician, who verified this to her.

41) Plaintiff went to the main Nurses station, told all present to please stop administering the morphine until he could speak to Dr. McGill the following Monday. On Saturday morning he faxed a notice to the nursing station requesting this again. When visiting Saturday night, plaintiff was not able to ascertain whether the morphine had been stopped or not. He left messages for Dr. McGill, and finally spoke to him later that week. Dr. McGill insisted that this was the only proper medication, and plaintiff chose to remain aquiescent. The ventilator nursing care system is one where beds are only available at intervals, and Mr. Schneller was aware of this and the fact that other facilities were not necessarily better in quality. Plaintiff pointed out that morphine would interfere with his mother's motivation and concentration.

42) Plaintiff specifically requested that from there on, he be informed of changes in his mother's medications, and was granted this request as informed of by staff, including the patient's social worker, Ms. Beth Orchnik.

43) It is unfortunate that the morphine was administered concurrently with a time wherein Marjorie was striving to improve. In the four weeks prior to then, she had been responding well to eating, and speech therapy. She had been sitting in a chair for a few hours a day. The staff all

8

knew her and communication occurred naturally despite the ventilator. Plaintiff avers that when anxious to get a point across Mrs. Schneller could even speak, right over the entire apparatus. Plaintiff repeated his request for use of an alternate pain killer.

44) George Schneller's health declined faster at this time. He remained home, but needed increasing amounts of assistance until his death on October 30, 2001.

45) On November 6, 2003, Marjorie was sent to Taylor Hospital, in nearby Ridley Park, for a blood transfusion, due to low red blood cell count, or anemia. Research by plaintiff has revealed that by discontinuing the prescribed ACTH [hormone replacement] which Mrs. Schneller had used prior to hospitalization, Dr. McGill had caused this anemia to occur. Lab tests show her red blood cell count to have been well below accepted levels for the duration of her stay at Prospect Park Nursing Center. Hemoglobin and hematocrit levels were often so low that calls were immediately made to the nurse from the testing facility. The causation of anemia by lack of ACTH is a scientific fact, and would explain why the low levels of important oxygen transporting blood components did not respond to transfusions.

46) Marjorie Schneller's improving health took a turn in November of 2001 that staff was not able or willing to explain. The issue was that she was not able to wean off of the respirator for a set number of hours each day. Facility notes indicate no record of physical changes, new infection, or debilitating events. Morphine was doubled after Marjorie complained of neck pain on November 14. Weaning was halted on November 20. Psychologist's notes on November 20 indicate that Marjorie was not sleeping at night because she slept all day from the morphine. Chest x-rays on November 21 showed no change in status from previous.

47) Marjorie Schneller was, in December of 2001, under unknown conditions, convinced to renounce as executrix of her husband's estate. It is unclear how Marjorie Schneller was convinced to renounce, nor to grant Power of Attorney to Richard Schneller 14 days prior, where she had insisted for 20 years that he not be included in any sort of fiduciary position.

48) The will and deed of trust of the Estate of George H. Schneller stipulated the funding of a trust for his spouse during her lifetime. The estate consisted of easily converted stocks and bonds, and cash. No effort was made to secure approval of account and fund this trust. Plaintiff's application to proceed in forma pauperis herewith is a result of numerous such decisions, culminating in continued manipulation of any estate monies that were deemed available, as retribution for legal action taken by plaintiff.

49) Letters of Administration c.t.a. of the estate of George H. Schneller were granted to the three siblings on December 31, 2001. This arrangement had been hurriedly agreed upon at the time of George Schneller's burial in November 2001, after plaintiff objected to proposals that R.

Schneller be substituted for the named executrix, Marjorie Schneller, or substituted for the alternate executrix, M. Zitomer;

50) Plaintiff maintained a position that communication with Mrs. Schneller be limited to the casual. Since she was not able to speak in sentences, and since there was a disagreement now present, contests in front of her would only become more complicated. Visits by defendant R Schneller were every one or two weeks, and every month by Ms. Zitomer. Plaintiff claims that unbeknownst to him, contact by defendants M. Zitomer and R Schneller with the patient began to include degradation of plaintiff's actions and capabilities.

51) The resident in the bed next to Marjorie Schneller was a woman named Dorothy, who was a tall and aggressive woman and extremely unhappy with being confined to bed. In August and September of 2001 she would yell suddenly and climb over the raised railings of her bed, including at night. This was frightening to any healthy person, and threatening to Marjorie Schneller, and continued despite complaints;

52) Marjorie Schneller suffered substandard care because of improper testing, or correction upon a showing of indicative test results. For instance, blood gas $CO_2$ and other gas readings, important indicators of the lungs' performance in the exchange of oxygen and carbon dioxide, were tested for only once during Mrs. Schnellers entire stay, rather than weekly or bi-weekly. Red blood cell counts were constantly low yet ineffective blood transfusions were utilized, while ignoring other causes. Electrolyte levels were consistently outside of accepted levels. Treatment for congestive heart patients requires careful monitoring of salts due to the use of diuretics to remove body water. Electrolyte imbalance can lead to heart arrythmias, which kill a large number of congestive heart failure patients ;

53) Marjorie Schneller on arriving at the Prospect Park Nursing Home in August had been granted visits from an occupational therapist. Three days a week, although presenting very weak, she began occupational therapy to regain motor coordination. Her legs supported her weight, so she was permitted to use the lavatory with supervision and began sitting in a chair for an hour or two a day. Small gains had been made, but occupational therapy was removed on August 28. Mrs. Schneller meanwhile had suffered an infection this first month of nursing care, and substantial shock at her situation, which began with some untoward event in her own home. Despite these setbacks she had made it clear in tests that her motor function was intact and that she was a candidate for neurorehabilitation. No occupational therapy was reattempted in the following months despite obvious gains in motor performance during the short lived therapy, and evident to all including plaintiff after that time, noticing for instance her gain in strength and ability to write. The anemia which remained untreated, and other errors, multiplied any weakness due to her condition;

54) Richard Schneller stated in December of 2001 his opposition to plaintiff's efforts to recuperate his mother in a conversation where plaintiff was told that to urge his mother towards returning home was wrong and personally motivated. Advisory literature encourages a return to home for ventilator patients where it might help, as the costs are about the same as post-deductible in-facility costs, and some patients benefit. Medicare benefits expired after 100 days or November 20, 2003. Marjorie Schneller deserved to return to the comforts of home and anticipated this. She had indicated to plaintiff her hope to assist him in his inquiry into what had happened to make her so ill on June 27, 2001, and plaintiff anticipated a time when she would be at ease under her own roof, free to talk. This was negligently and intentionally prevented by defendants, who denied even basic rehabilitation, and planted the seeds of failure at mention of her proceeding to freedom;

55) R. Schneller and Ms. Zitomer were responsible for events where Marjorie Schneller was misinformed and traumatized during plaintiff's brief travel out of town; each time, when plaintiff returned to the nursing home, his mother was in a condition of panic and distress the intensity of which she had never before exhibited;

56) As plaintiff noticed and resisted sibling's subterfuge, he began to be needled in any sphere challengable; his fledgling business in sales and product development was superficially declared not viable, and he was consistently and falsely accused of accounting ineptitude. This was easily accomplished, under the heading of concern for plaintiff, which was present in the instruments, because of his earlier incapacity;

57) At some point in January 2002, a new will, incorporating the deed of trust for Mrs. Schneller, was sent to all three siblings by Mr. Pepper with instructions for the administrators to have Marjorie Schneller sign it. This will removed the corporate trustee of trusts left to plaintiff, and substituted Richard Schneller. This activity was errant and contrary to the intent of both testators. The corporate trustee in these nearly identical trusts had been specifically devised to be the dominant and decision making trustee;

58) Plaintiff has since declared that renunciation of executorship by Marjorie Schneller was conspired to and performed behind plaintiff's back, where the executrix, being entirely adept and alert, would have enjoyed the task and the responsibility that this position required, and also the contact with life and tasks that it would have engendered. Two primary goals for ventilator-dependent patients who have retained their higher level functions are: a) gaining independence through decision making, and b) continuation of interests allowing control by the patient of their own life. Plaintiff due to proximity would have been the resultant go-between, and this was the reason why this logical step was nullified;

59) Plaintiff was at this time unrepresented, insofar as a) Mr. Pepper, attorney for the administrators, was, unbeknownst to plaintiff, not always acting in the interests of the estate, nor of the remaining spouse Marjorie Schneller, nor of plaintiff, now a co-administrator in name

11

only, and b) where plaintiff had seperated himself from all parties, due to, inter alia, an occasion where R. Schneller had attempted to bring Mr. Pepper into matters involving a since resolved auto insurance claim of plaintiff's to which plaintiff stated he would find an insurance attorney if necessary, and objected at that time to Mr. Pepper's retainment fee and other details of that arrangement.

60) At a family meeting on January 18, 2002 Richard Schneller attempted to discredit plaintiff in front of the staff of this facility, for his requests for non-narcotic pain killers, liquids and soft foods, and especially for permission for Marjorie Schneller to speak for a few minutes each day. Plaintiff maintained his position for rehabilitation, as he felt it was staff lethargy that kept her from enjoying the simple changeover in her trach tube mechanism for a few minutes of conversation, and because, since her improvement had levelled, not ended, a daily use of her voice might help her feel like a member of the human race and spark an upturn. Weeks of inaction had run into months. With the new year plaintiff hoped to concentrate on rehabilitation, a return home, and knew these were still possible.

61) The staff at this facility after Richard Schneller's detraction of plaintiff appeared to heed plaintiff's wishes to a lesser degree. Plaintiff, sensing urgency, hastened his efforts to have his mother evaluated by outside specialists.

62) Richard Schneller at this time requested that the protective rails around Marjorie Schneller's bed be raised 24 hours as he was afraid of her falling. Plaintiff objected due to the fact that she was in full control of herself, there had been no change, and that the rails were already closed at night. Nevertheless the request was granted, resulting in Marjorie feeling even more confined, she being a person accustomed to using a cane, walker, and being driven or wheelchaired about.

63) Plaintiff began to arrange for a visit by a neurologist. Marjorie Schneller was in need of an evaluation by such a professional due to cervical pressure from osteoporosis in vertebrae C 2, 3, and 4, and spinal compression fractures that had occurred in June of 2001, presumably at the time of the unexplained suspected trauma while alone that resulted in her hospitalization and this nursing home placement. No orthopedist or neurologist had followed up since her release from the hospital, yet morphine was being administered in liberal doses. The study of neurology is the fastest growing field of information in modern medicine, and specialists can in a short time have access to methods not heard of a year prior.

64) Plaintiff was at this time pointedly informed twice, by a staff member and a nurse, that medical issues requiring any visit by a specialist physician had been fully addressed at the family meeting just held. A pulmonary physician, defendant Dr. Heffelfinger, had been present at the meeting, and had explained the pessimism about regaining independent breathing, and wariness of eating, based on a set of weaning parameters produced at the meeting. Plaintiff accepted his

advice and reccommendations as to general health, but knew of a need for specific matters to be addressed by an appropriate specialist.

65) Soon after, on February 3, 2002, Marjorie Schneller was admitted to Taylor Hospital, a hospital near to the Nursing Home, because of a sudden drop in blood pressure.

66) Two nurses in the emergency room at Taylor Hospital exclaimed to James Schneller about the dehydrated condition of his mother and other errors in her care. Plaintiff asserts that transfer to the hospital was anticipated and conspired to, indicated for instance by a sparsity of Nurse's notes which dwindled during that month to a noticeably smaller volume.

67) In the hospital, plaintiff noted within 24 hours a rise in blood pressure to near normal reading. X - rays showed no change for the negative in Marjorie Schneller's lungs. A pneumonia was suspected. Marjorie was conscious and communicative. She had been removed from morphine treatment. A physicians report on March 5, 2002 indicates absence of pain in her neck, though morphine had been stopped.

68) The issues spoken of in this complaint became even more pronounced. Physicians named herein also treated Marjorie at Taylor hospital. Marjorie Schneller was eventually deprived of all care, in a surreptitious manner, in a second nursing home chosen optimistically by plaintiff, where defendant siblings were able to completely overwhelm plaintiff's proper aims and attempts to steer her care. Marjorie Schneller died on March 31, 2002.

## Additional Errors And Omissions

69) Marjorie Schneller for the duration of her stay at Prospect Park Nursing Center tested outside of acceptable levels for compounds including these, and with atypical resolution some of which is described here

| | |
|---|---|
| 70) Hemoglobin, hematocrit, indicating anemia | basic iron supplements or epogen were foregone until January 24. Transfusions were needless |
| 71) BUN, indicating dehydration | water intake never adjusted |
| 72) Blood gas $CO_2$ and other readings | indicator of poor gas exchange. One test given despite reassurances to plaintiff of steady monitoring |
| 73) Electrolytes; i.e. sodium, potassium | remained outside normal levels |

13

74) Marjorie Schneller was not included in weekly care conferences. Federal regulations require that other than those deemed incompetent, a resident may participate in planning care and treatment or changes in care and treatment. Plaintiff asserts that Marjorie Schneller, making the adjustment to being immobile, and obviously in posession of her intellect and wit, was a candidate for inclusive stewardship of her care plan and deserved to be included in weekly conferences at bedside. Nursing Home research consistently shows marked improvement in rehabitatability when patients are given greater measure of control of their situations.

75) This deprival of relevance was compounded by the taking of any administrative role in her husband's estate from her. Marjorie was concerned about plaintiff, who had evolved into caregiver, and who had been rehabilitated under the care of his parents. Concocted stories about plaintiff were used to coerce her. It is claimed that the thorough removal of responsibilities from her life contributed to death with as much force and effect as the many other errors and omissions in her care. Defendants R. Schneller and M. Zitomer in making decisions about Marjorie Schneller's life placed fear of compromise of their inheritance above Marjorie Schneller's recuperability;

76) Marjorie Schneller's care plan resulted in a presumed intentional weight gain to 25% greater than accustomed body weight. This created a greater burden for her lungs, to oxygenate 25% more tissue. This weight also interfered with the patient's recuperable ability to move or perform tasks, because of additional weight and additional strain on heart and lungs. Again confinement and obstruction to motivation were the outcome.

77) The failure of Prospect Park Nursing Home to allow intake of liquids and soft foods was one of a number of grossly negligent and wanton decisions. Mrs. Schneller was awake and observant for the waking hours. She saw food provided for other residents. She had had an 'appetizer' of a dozen or two days of speech and eating trials of liquids and purees. Facility staff refused a continuation of this easily completed progression, and their reason was a claimed danger to the health of the patient. Thus the defendants, while deleteriously vocalizing and contributing to a lessened possibility of continued life, were also denying the right to enjoy life. Plaintiff asserts that this reckless decision was additionally based on insurance considerations, and caused great amounts of physical and emotional pain to the victim;

78) Marjorie Schneller would complain of labored breathing every few days. This is a sympton which is a redundancy in a ventilator unit, and it's frequency indicates some improper setting on her ventilator or other error;

79) Respiratory technicians continually mistreated Marjorie Schneller during respiratory suction, where suction tubes were regularly inserted harshly, causing Marjorie Schneller to cough violently from the scraping or jarring of, rather than gentle contact with, the inside of her trachea

14

She would wince, cough, and cringe from pain, all at the same time, during rough treatment like this;

80) Plaintiff continually requested permission to speak with his mother and was rebuffed. Marjorie Schneller's ability in September and October of 2001 to speak through the tracheal tube was replaced by staff admonitions to not speak as if it was unhealthy, again at the same time as their actions and even statements questioned or infringed upon her longevity; no detailed or scientific explanation was ever given.

81) Recommendations up to late September by the speech therapist as to continued speech and eating end without explanation. At the meeting on January 18, plaintiff, after insisting that at least a few minutes of talking be allowed per visit, was granted permission. Upon request the next evening, plaintiff was told that only the daytime nurse was able to facilitate speaking sessions, despite there being two vent nurses on staff around the clock. Marjorie Schneller thus continued to be deprived of her ability to communicate with anyone, as speech therapy had been ended earlier;

82) A psychoactive assessment on January 24, 2002 states that Marjorie Schneller was withdrawn and refusing care in the previous two weeks. This was reason for alarm yet nothing was attempted in the way of notifying plaintiff and attempting resolution through family interaction with family. In prior months plaintiff been given notice of developments such as this on his daily visits;

83) In January of 2002, dwindling Nurses notes, removal of therapies, and the withdrawing or refusing of care by Marjorie Schneller, among other changes, are indicators of a change in course among staff, where a decision had been made to deny care. To plaintiff's observation the patient remained physically the same, communicative, optimistic, not noticing anything new with her health, and wishing she could eat;

84) Plaintiff was not informed of changes in his mother's medication as had been agreed to with facility staff. For instance, the morphine dosage was doubled on November 14th and 50% added to that on December 7, 2001. The facility had a legal responsibility to inform plaintiff of this increase and any other changes, and the reasons therefor;

85) A copy of Marjorie Schneller's Advanced Care Directive with living will and appointment of health care representative was found to have been faxed to the Prospect Park Nursing Home with Richard Schneller's name prominently written on it. It is not known whether Ms. Zitomer, alternate surrogate to George Schneller, contacted this nursing home, nor how often, but her role as representative never existed because Marjorie Schneller was never incompetent, and further, the wording in the document requires the patient to be "incompetent and in a terminal condition or in a state of permanent unconsciousness";

86) The power of attorney signed to Richard Schneller by Marjorie Schneller did not include a clause calling for his approvals as to day to day medical decisions or creating a role as caregiver. This document is claimed to be nearly identical to the power delivered at some point to M Zitomer. The document allowed for approval of medical and surgical procedures, and entering into agreements for care with institutions. Plaintiff was the obvious caregiver but was forestalled at numerous and important instances in his attempts to improve Marjorie Schneller's condition.

87) Plaintiff asserts that Marjorie Schneller died as a result of the wrongful acts and omissions named herein. Poor or intentional medical decisions resulted in lost opportunities for rehabilitation. Rehabilitative measures were nullified by inappropriate or addicting drugs. Occupational uplifting was replaced by an outright denial of the essentials of speaking and eating. Caregivers condoned these actions, occluded plaintiffs' perception, and harmfully deprived the patient of self esteem.

III.   CLAIMS

COUNT IA - VIOLATION OF THE ASSISTED SUICIDE FUNDING RESTRICTION ACT OF 1997

HEIRS AND BENEFICIARIES OF MARJORIE C. SCHNELLER, BY AND THROUGH JAMES D. SCHNELLER, ESTATE OF MARJORIE C. SCHNELLER, BY AND THROUGH JAMES D. SCHNELLER  V.  PROSPECT PARK NURSING AND REHABILITATION CENTER; MARJORIE ZITOMER, RICHARD SCHNELLER; T. SERGEANT PEPPER ESQUIRE

88) Plaintiffs incorporate by reference paragraphs 1 through 373 as if fully set forth at length herein

89) Defendants through their acts as alleged caused a treatment by said acute care and nursing facility and personnel which was intentionally designed to cause the death of Marjorie C. Schneller by improper means, including euthanasia, mercy killing, and assisted suicide.

90) Defendants knowingly, directly, and intentionally applied funds appropriated by Congress for the purpose of paying for the provision of health care services, and federal funds under certain

grant programs including Medicare and Medicaid, and federal advocacy grants, to the cost of the causing of the death of Marjorie C. Schneller by improper means which included euthanasia, mercy killing, and assisted suicide.

91) Defendants illegally used said funds to pay for and to provide health care items and services connected and related to the death of Marjorie C. Schneller by unlawful means including euthanasia, mercy killing, and assisted suicide.

92) Any pharmacological treatment which is claimed to have been necessary for the comfort of Marjorie Schneller was given to her for the express purpose of ending her life.

93) Defendants knowingly, directly, and intentionally applied funds appropriated by Congress including federal funds under certain grant programs, and federal advocacy grants, to pay for and provide for services which directly contributed to the assisting and causing of the death of Marjorie C. Schneller, by unlawful means including euthanasia, mercy killing, and assisted suicide.

94) Defendants intentionally caused to Marjorie Schneller, by force, duress and deception, the unlawful implementation of her revoked advance health directive, and the resulting wrongful use of Federal funds for the death of Marjorie Schneller.

95) Defendants intentionally aided and solicited Marjorie Schneller to aquiesce to the unlawful implementation of her revoked advance health directive, and said conduct contributed to the wrongful use of Federal funds for the mercy killing, euthanasia, and death of Marjorie Schneller.

95) Defendants administered, dispensed, delivered, and prescribed a controlled substance, to Marjorie Schneller who was known to defendants to be a person for whom such a treatment was inappropriate. Said acts fell outside of of the treatment principles that are accepted by any responsible segment of the medical profession and the laws of Congress and the Pennsylvania legislature. The cost of said substance was attained from Federal funds. Marjorie Schneller died as a result of forced ingestion of the substance.

96) Defendants during this time concealed diagnoses and intentionally deprived care to Marjorie Schneller. In order to implement their concealing and deprival of care, defendants conferred, networked, diagnosed, prescribed, tested, described, recorded and performed any and all of the necessary components of said medical treatment, at a cost to the federal funds above listed.

97) Defendants in their acts of said concealment and deprival of care, acted with full knowledge that the federal funds that were charged for their activities, were utilized in order to implement their act of assisted death, mercy killing, euthanasia, and murder.

98) Through their acts stated in this Count defendants violated 42 U.S.C.A.§ 14401 et seq entitled Assisted Suicide Funding Restriction.

grant programs including Medicare and Medicaid, and federal advocacy grants, to the cost of the causing of the death of Marjorie C. Schneller by improper means which included euthanasia, mercy killing, and assisted suicide.

91) Defendants illegally used said funds to pay for and to provide health care items and services connected and related to the death of Marjorie C. Schneller by unlawful means including euthanasia, mercy killing, and assisted suicide.

92) Any pharmacological treatment which is claimed to have been necessary for the comfort of Marjorie Schneller was given to her for the express purpose of ending her life.

93) Defendants knowingly, directly, and intentionally applied funds appropriated by Congress including federal funds under certain grant programs, and federal advocacy grants, to pay for and provide for services which directly contributed to the assisting and causing of the death of Marjorie C. Schneller, by unlawful means including euthanasia, mercy killing, and assisted suicide.

94) Defendants intentionally caused to Marjorie Schneller, by force, duress and deception, the unlawful implementation of her revoked advance health directive, and the resulting wrongful use of Federal funds for the death of Marjorie Schneller.

95) Defendants intentionally aided and solicited Marjorie Schneller to aquiesce to the unlawful implementation of her revoked advance health directive, and said conduct contributed to the wrongful use of Federal funds for the mercy killing, euthanasia, and death of Marjorie Schneller.

95) Defendants administered, dispensed, delivered, and prescribed a controlled substance, to Marjorie Schneller who was known to defendants to be a person for whom such a treatment was inappropriate. Said acts fell outside of of the treatment principles that are accepted by any responsible segment of the medical profession and the laws of Congress and the Pennsylvania legislature The cost of said substance was attained from Federal funds. Marjorie Schneller died as a result of forced ingestion of the substance.

96) Defendants during this time concealed diagnoses and intentionally deprived care to Marjorie Schneller. In order to implement their concealing and deprival of care, defendants conferred, networked, diagnosed, prescribed, tested, described, recorded and performed any and all of the necessary components of said medical treatment, at a cost to the federal funds above listed.

97) Defendants in their acts of said concealment and deprival of care, acted with full knowledge that the federal funds that were charged for their activities, were utilized in order to implement their act of assisted death, mercy killing, euthanasia, and murder.

98) Through their acts stated in this Count defendants violated 42 U.S.C.A.§ 14401 et seq entitled Assisted Suicide Funding Restriction.

99) Defendants' actions were negligent, willful, wanton, and reckless, thus entitling plaintiffs to punitive damages.

WHEREFORE, the plaintiffs claim of defendants compensatory damages in excess of One Hundred and Fifty Thousand Dollars ($150,000.00), delay damages pursuant to Pa. R.C.P. 238, interest, and allowable costs of suit.

COUNT IB - CIVIL ACTION FOR DEPRIVATION OF RIGHTS

JAMES D. SCHNELLER, HEIRS AND BENEFICIARIES OF MARJORIE C. SCHNELLER, ESTATE OF MARJORIE C. SCHNELLER, BY AND THROUGH JAMES D. SCHNELLER AND MARJORIE ZITOMER, ; ESTATE OF GEORGE H. SCHNELLER, BY AND THROUGH JAMES D. SCHNELLER   V.   PROSPECT PARK NURSING AND REHABILITATION CENTER;    MARJORIE ZITOMER; RICHARD SCHNELLER; T. SERGEANT PEPPER ESQUIRE

100) Plaintiffs incorporate by reference paragraphs 1 through 373 as if fully set forth at length herein.

101) At all times the defendants were required under the Constitutions, and Acts of Congress and the Pennsylvania Legislature to not obstruct, nor conspire to obstruct, all avenues of due process which were available to the defendants, including for remedy of wrongs and errors, and as licensed professionals, facility operators, and fiduciaries and attorneys, to be candid with defendants about all aspects of diagnosis and treatment.

102) At all times the defendants were required under the United States Constitution and the Acts of Congress to not obstruct, under color of State statute, regulation, custom, usage, nor under the avenues of the legal and administrative process, any rights of the plaintiffs, including for access to tribunals and courts and remedy of wrongs and errors.

103) Defendants, under color of statute, regulation, custom, and usage, of the Commonwealth of Pennsylvania, subjected plaintiffs, and caused plaintiffs to be subjected, to the deprivation of rights and privileges that are secured by the Constitution and laws of Congress.

104) Defendants, as medical facility, as regulatees of the Federal, State and Local government, as licensed professionals, and as fiduciaries, had a duty to act within the law and to adhere to every

laws, statutes, and rules which applied to them.

105) Plaintiffs were continually denied due process and as a result of that they were deprived of life, liberty, and property and otherwise harmed. Defendants failed to protect plaintiffs and caused state created danger to plaintiffs.

106) In their alleged acts, the defendants, under color of statute, regulation, custom, and usage, caused deprivation of rights to plaintiffs such as in their implementing of the advance health directive of Marjorie C. Schneller despite the fact that it was revoked and which, even if not revoked, did not direct implementation of it while Marjorie Schneller was conscious and attentive. Defendants asserted to plaintiff that he was not within the law, such as in his demanding that his power of attorney was the controlling power of attorney.

107) A duty existed for defendants who are legal practitioners and/or licensed professionals to provide, and to not obstruct, due process, where for instance numerous avenues to due process and it's cousins are set up in the statutes regarding their particular specialties.

108) Defendants in furtherance of their acts made numerous adjudicative acts and statements to plaintiff that legal authority was within the defendants, and that defendants had, under such authority, decided or taken decisive action in the matter of Marjorie C. Schneller.

109) As a result of the acts of defendants plaintiffs were injured and were deprived of life, liberty, and property.

110) Professional defendants were charged with the duty to adhere to the statutory directive of the Constitution of the United States of America and acts of Congress, and state laws, rules and regulations, and to uphold the medical and/or corporate responsibility to maintain qualified staff, establish procedures, and enforce the adherence to the standards of care and state laws, rules and regulations, including by their staff and employees, or the professional responsibility to represent parties while maintaining the standard of ordinary skill and knowledge of a legal practitioner while conforming, as officers of the court, to the Rules of professional Conduct and under all other standards of the legal profession as required in the Commonwealth of Pennsylvania. At all times the defendants were required under the Constitution and Acts of Congress to not obstruct nor conspire to obstruct any avenues of due process which were available to the defendants, including for remedy of wrongs and errors, and as licensed professionals, facility operators, and fiduciaries and attorneys, to be candid with defendants about all aspects of diagnosis, treatment, administration, and all other occurrences of import.

111) In committing their intentional acts and omissions defendants breached said duties.

112) Plaintiffs in the acts alleged were continually deprived the due process, and rights, liberties, privileges and immunities, which are guaranteed by the Constitution.

113) The acts of defendants wilfully caused loss of life and liberty including the victim's death, a strict immobility and fear of death imposed upon her, and suffering to plaintiffs including anguish that Marjorie Schneller's life was to be ended through an intentional killing, rather than extended, as they were aware lay ahead if said mistreatment was overcome, and all additional harms as stated in this claim.

114) Marjorie C. Schneller was deprived of liberty, property, and, ultimately, life itself, without an affording by any party and occlusion by all parties of that right to notice and hearing, nor administrative solution, afforded under federal law to the incapacitated and to those whose life support is endangered.

115) Defendants' acts constitute a willful deprival to plaintiffs of essential rights and liberties including the right to possession and defense of property, the right to security in surroundings and possessions, and the right to privacy, as guaranteed under the United States Constitution. Defendants' acts pointedly deprived plaintiffs of their right to privacy in the family relationship and in the relationship of dependant James Schneller who was regularly educated by Marjorie Schneller.

116) The acts of defendants intentionally deprived Marjorie Schneller of the basic and mandatory rights and liberties which are guaranteed by the Constitution, including the right to live, to eat, to speak, to privacy, to travel, to choose her daily regimen and health program, to meaningful family visits, and her right to foundational privileges and immunities.

117) Plaintiff's rights were infringed upon through selective limitations to plaintiff's resistance, by administrative defendants, including under color of law, ordinance, custom, and usage, which were, in an unconstitutional manner, based on the fact that plaintiffs were not represented by an attorney, or had not filed suit, or similar threshold circumstances.

118) Whatever access to the Courts and remedies were available to plaintiffs were not freely exercisable without hindrance nor fear of retaliation.

119) Defendants including for the above reasons are liable to plaintiffs under 42 U.S.C.A. § 1983 entitled Civil action for deprivation of rights.

120) Defendants' actions were negligent, willful, wanton, and reckless, thus entitling plaintiffs to punitive damages.